# In the United States Court of Federal Claims

No. 09-837T
(Filed: February 28, 2012)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | \* | |
| **LOUIS KOBUS, JR.,** | \* | |
| | \* | 26 U.S.C. § 6672; withholding taxes; willful; |
| Plaintiff, | \* | trust fund penalty; refund and collection suit; |
| | \* | presumption of correctness; |
| v. | \* | taxpayer's burden of proof; estimates; |
| | \* | substitute return; 26 U.S.C. § 6020; |
| **THE UNITED STATES,** | \* | redemption; 26 U.S.C. § 7425 |
| | \* | |
| Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*John F. Rodgers*, Redmon Peyton and Braswell LLP, Alexandria, VA, for Plaintiff.

*Jason Bergmann*, Trial Attorney, Tax Division, with whom was *Shelley D. de Alth*, Trial Attorney, Tax Division, United States Department of Justice, Washington, DC, for Defendant.

---

### OPINION & ORDER

---

**DAMICH**, Judge:

This is a tax refund case concerning penalties that the Internal Revenue Service ("IRS") assessed on and collected from Plaintiff Louis Kobus, Jr. The main issue in this case is whether it was proper for the IRS to assess Kobus with tax penalties for his role in allowing his corporation, Village Turf, Inc., to fail to pay over to the government the taxes it had withheld from its employees' paychecks ("withholding taxes"). Kobus claims he is entitled to a refund of all amounts the IRS has collected from him. The Government counterclaims to collect the unpaid balance of the penalties, plus interest and fees. The amounts at issue total approximately $315,000.

The IRS assessed the penalties under 26 U.S.C. § 6672, which permits the IRS to assess a personal penalty, equal to the amount of the taxes not paid by the employer, on any person who is responsible for ensuring that the employer collects and remits withholding taxes and who "willfully" fails to have the employer collect, account for, or pay such taxes. The parties do not dispute that Plaintiff, who was Village Turf's founder, president, and sole and controlling

shareholder, was responsible for collecting and remitting the taxes.  The main factual dispute is whether Plaintiff willfully failed to pay over the withholding taxes.  Under § 6672, a taxpayer acts willfully if either he knowingly fails to pay withholding taxes or he acts with a reckless disregard of a risk that withholding taxes will not be paid.

To resolve the disputed factual issues relating to willfulness, the Court held a two-day trial on October 26 and 27, 2011, with closing arguments held on December 1, 2011.[1]  The issues have been fully heard, and this case is now ready for decision.

After careful consideration, the Court finds that Kobus is liable for the penalties.   The Court finds that, during most of the periods at issue, Kobus knew that Village Turf was not remitting its withholding taxes and he chose not to pay over the funds to the IRS.  For the remainder of the periods, the Court finds that, after Kobus learned that Village Turf had not paid over withholding taxes in past tax periods, Kobus chose not to pay the past deficiencies, despite having funds to do so.  Therefore, Kobus willfully failed to pay over the withholding taxes and he is liable for the tax penalties for all periods at issue.

## I.    Background

### A.    Withholding Taxes and The Penalties Assessed on Kobus

The Internal Revenue Code imposes on every employer the obligation to collect from its employees both federal income taxes and Federal Insurance Contributions Act ("FICA") taxes. 26 U.S.C. §§ 3101, 3102, 3111, 3402 (2006).  Employers collect the taxes by withholding funds from employee wages.  §§ 3101, 3111.  Employers do not immediately remit the withheld taxes to the government; instead, they hold the funds "in trust" until they remit the funds by making a federal tax deposit at an authorized financial institution.  *Id.* at § 7501.  The taxes withheld from wages commonly are referred to as withholding taxes or trust-fund taxes.  When the employer makes a withholding-tax deposit, the employer also must remit a matching FICA tax payment for each employee.[2]

Employers typically remit withholding-tax deposits on a semiweekly or monthly basis.[3] The IRS requires each employer to file a withholding-tax return, which the IRS uses to track deposits and to calculate the employer's withholding tax liability.  Most employers are required to file a withholding-tax return each quarter (Form 941).  The IRS permits seasonal employers to

---

[1] Citations to the trial transcript will be "Tr. at __" and citations to the closing argument transcript will be "Closing Arg. Tr. at __".

[2] FICA taxes are comprised of a 12.4% tax for Social Security and a 2.9% tax for Medicare, with half being paid out of employee wages and half being paid by the employer.  §§ 3101, 3111.  Only the employee's half of the FICA tax is considered a withholding tax.  The effect of this system is that every employee's salary is actually 7.65% higher than listed on a paycheck because the employer is making a FICA tax payment on behalf of the employee that the employee does not see.

[3] At the times at issue in this case, the funds were paid over to the IRS by making a deposit at a bank with a tax coupon.  Now payments can be made electronically.  Tr. at 367.

account for the taxes by filing one return annually (Form 943).  For some of the tax periods at issue in this case Village Turf filed quarterly returns and for some it filed annual returns.

Withheld taxes are credited to the employee regardless of whether the employer pays them to the Government.  Because the employer is not required to pay over the funds upon their collection, the withheld amounts can "be a tempting source of ready cash to a failing corporation . . . ." *Slodov v. Unites States*, 436 U.S. 238, 243 (1978).  To prevent misuse of the funds, the IRS not only will hold the employer liable for any unpaid withholding taxes, but it also can assess a personal penalty, equal to the amount of the unpaid taxes, on any person who is responsible for the employer's failure to pay the taxes.  *Id.* at 244-45; *Godfrey v. United States*, 748 F.2d 1568, 1574-75 (Fed. Cir. 1984); § 6672.

In this case, it is undisputed that, between 1996 and 2003, Village Turf did not pay over to the IRS most of the taxes it had withheld from its employees' paychecks.  After Village Turf did not take any action to pay its deficiencies, the IRS assessed a personal penalty on Kobus.  There is no question that Kobus, who was Village Turf's founder, president, and controlling shareholder, was the person responsible for ensuring the company was collecting and remitting its withholding taxes.[4]

The IRS assessed the penalties for 12 distinct tax periods: 1996, 1997, 1998, 1999, 2000, 2001, the second quarter ("Q_") of 2002, Q3 2002, Q1 2003, Q2 2003, Q3 2003, and Q4 2003.  Through levies and garnishments, the IRS has collected money in satisfaction of the penalties for 1996 to 2000 and for some of 2001.  Plaintiff requests a refund of all payments that the IRS has collected from him.  Kobus has a remaining unpaid penalty balance for part of 2001 and for all of Q2 2002, Q3 2002, Q1 2003, Q2 2003, Q3 2003, and Q4 2003.  The Government counterclaims to collect the outstanding balance of the unpaid penalties.  Kobus filed an administrative appeal with the IRS on July 7, 2004, but the IRS Appeals Division denied the appeal on November 4, 2005.  Joint Exhibit ("Ex.") 71; Ex. 66 at 14; *see* Tr. at 365.  Kobus then filed this case on December 7, 2009.

The primary factual issue is whether Kobus willfully failed to pay over the withholding taxes.  However, this case also presents several ancillary issues that the Court must resolve.  As a preliminary matter, the Court must determine the proper allocation of the burden of proof because the parties dispute who bears the burden of proving that Kobus acted willfully.  Complicating this issue is the Government's contention that Kobus should be liable for the spoliation of the evidence because many of Village Turf's business records were lost or destroyed after the IRS began investigating Village Turf.  Next, Kobus argues that, if the Court determines he acted willfully, his 2003 liability should be reduced because the IRS's penalty assessments were based on incorrect estimates of Village Turf's annual wages.  Finally, Kobus argues that the Government improperly preferred itself to Kobus's other creditors when it purchased and resold Kobus's house after a senior creditor foreclosed on it.

---

[4] The IRS also assessed the § 6672 penalties on Susan Clay, and she and Kobus are jointly liable for the penalties.  From 2000 to 2002, Clay was listed as the corporate secretary on Village Turf's state registration.  Her role in this matter is discussed in detail, *infra*.

### B.      Factual Background

### 1.      Plaintiff's Operation of Village Turf

Kobus is an agricultural engineer, who served in the U.S. Marine Corps. for 23 years.  Jt. Stip. Facts ("Stip.") ¶¶5, 7.  During his service in the Marine Corps, Kobus held several positions, including "Director of Facilities Management," where he was responsible for a $17 million budget, and "Head of Budget and Programming," where he prepared 5-year budgets.  Tr. 97-99; *see* Stip. ¶6.  In both positions, he was responsible for managing a large number of personnel.  Stip. ¶6.  After he retired, he formed Village Turf, Inc., in 1993, which initially was a landscaping and lawn maintenance business.

Village Turf was a Virginia corporation, and it operated out of various locations in Fairfax County, Virginia.  Stip. ¶¶8, 10.  Kobus employed landscaping crews to do most of the physical labor, and he oversaw the crews and handled quality control.  Tr. at 24-28.  Though he performed some field work, Kobus spent most of his time promoting Village Turf and trying to find new business and clients.  Tr. at 24-28.  Kobus also employed an office staff which handled most of the day-to-day tasks of running the business.  Throughout much of Village Turf's existence, Kobus was its only corporate officer.  From May 2000 to March 2002, however, Susan Clay officially was listed as Village Turf's corporate secretary.  Exs. 60, 62.

Sometime around 2000, Kobus was offered the opportunity to purchase a retail store and a dealership agreement with Southern States Cooperative, Inc., a company that distributes agricultural products.  In 2001, Kobus purchased the store, and Village Turf entered into a dealership agreement with Southern States.  Before entering into the agreement, Village Turf provided Southern States with several financial documents, including a balance sheet, income statement, and profit-and-loss statement for 2000.  Stip. ¶¶80-81.  According to his testimony, Kobus invested $450,000 in the store, including granting Southern States a $150,000 deed of trust on his home as collateral for inventory purchases.  Tr. at 76.  He also signed several Uniform Commercial Code ("UCC") security agreements giving Southern States rights to his inventory, proceeds from inventory, and other assets.  Stip. ¶¶86-88.[5]

As Kobus was busy working on the landscaping business, he decided that he would be unable to dedicate his time to starting up and running the retail store, which was located 40 miles away in Fredericksburg, Virginia.  Tr. at 36-37.  Consequently, Kobus hired Daniel Lagasse to set up and manage the retail store.[6]  Stip. ¶89.  Lagasse set up the store's financial systems, hired its employees, and got the store ready for business.  In June 2001, the retail store opened.  Stip. ¶92.

---

[5] Kobus also entered into similar agreements with Wetsel, Inc., another company that sold agricultural products.  Stip. ¶88.

[6] Lagasse's official title was "regional manager."  At the time, Kobus planned on opening a number of stores, and he hired Lagasse to help him open and manage all of them.  Tr. at 415-17; *see* Tr. at 193.

In 2001, Fairfax County charged Village Turf with a zoning violation over the company's use of the property where its landscaping office was located.  The County asserted that Village Turf's construction of a storage shed and the overall character of its use of the property were not consistent with the property's zoning classification.  Stip. ¶¶179, 302.  The County imposed over $100,000 of fines on Village Turf, Kobus, and Clay, the owner of the property.  Stip. ¶180; Ex. 144.  It also issued a final decree ordering Village Turf and Kobus to cease using the property as a contractor's office and shop with outdoor storage of construction equipment.  Stip. ¶181; Ex. 142.

In 2003, Kobus attempted to set up a new corporate entity to operate the retail store.  Tr. at 69-70.  In November 2003, Kobus formed VTSS, Inc., Ex. 64, and he acquired a new employer identification number for the store from the IRS, Stip. ¶¶107-12.  The record shows that Kobus did not fully transfer control of the retail operations to VTSS during 2003, which is the last period at issue in this case.[7]

By 2004, Village Turf eliminated the landscaping side of its business because the County's zoning rulings had prevented Kobus from operating it.  Then, in the first quarter of 2004, Lagasse resigned and left the retail store.  Stip. ¶149.

Kobus continued to operate the retail store for another year, although it was difficult to keep the business afloat.  *See* Tr. at 62, 82 (store closed around February 2005).  In 2005, Southern States cut off Village Turf's credit line.  *See* Ex. 165 at 2; Tr. at 62.  In 2005, Village Turf was unable to pay rent on the retail store and the landlord evicted Village Turf from the store location.  In 2006, Virginia terminated Village Turf's corporate existence.  Stip. ¶8.  After Village Turf was evicted and the store closed, Southern States was unable to collect the outstanding balance on Village Turf's inventory account.  In 2008, Southern States foreclosed on its lien on Kobus's home.

### 2.    The Role of Village Turf's Office Staff in Tax Matters

As Village Turf's owner, Kobus handled mostly higher level duties, such as quality control and finding new business, and he delegated to his office personnel most of the day-to-day tasks of running the business.  The delegated tasks included the preparation of Village Turf's payroll and the collection and remitting of withholding taxes.  Over the course of the tax periods at issue, 3 different office employees had the duty of preparing Village Turf's payroll.  Each of the 3 employees had different responsibilities at Village Turf, and each employee's payroll preparation duties varied based on their other responsibilities.  In 1996, the first tax period at issue, Evelyn Woods was the employee who was responsible for preparing payroll and for remitting withholding taxes.  Stip. ¶¶24-26.  While Woods was working for Village Turf, the company remitted most of the withheld taxes to the United States and it properly filed its withholding-tax returns.

---

[7] In 2003, Kobus's efforts at separating the businesses were incomplete because he filed a joint federal-income-tax return (Form 1120S) for the two businesses for that year.  Stip. ¶112; Ex. 53 at 1, 9; Tr. at 408-09.  Additionally, it does not appear from the record that Kobus transferred Village Turf's agreements with Southern States to VTSS.

Around March of 1997, Woods retired, and around that time, Kobus began working with Susan Clay.  Stip. ¶¶31-32.  Although Clay was not a Village Turf employee, she was responsible for entering accounting data into the payroll system and for preparing the payroll.[8] Stip. ¶¶31, 170-71.  Clay was not, however, explicitly assigned the duty to remit withholding taxes.  Stip. ¶¶170-71.  Over the next few years, Clay became more involved with Village Turf, and in 1999, she was given check signing authority on Village Turf's bank accounts.  *See* Stip. ¶19.  In 1999, Village Turf relocated to a property owned by Clay, which she permitted Village Turf to use rent-free.  In May 2000, she was registered with the State Corporation Commission as Village Turf's corporate secretary.  Ex. 60.  Though Clay appears to have been fairly involved with the business, she was never an official employee of Village Turf and never received a regular paycheck.  Tr. at 208, 213-14.  Clay continued preparing the payroll for the landscaping operation through 2003.  Tr. at 420-23; *see* Tr. at 39, 192-93.

As noted earlier, in 2001, Lagasse began working for Village Turf, and Lagasse managed many aspects of the retail store.  It is undisputed that Kobus gave Lagasse authority to manage the store, handle its payroll,[9] and pay at least some of the store's bills, but the parties dispute the extent of his bill-paying authority.  The parties agree, however, that Kobus left much of the day-to-day management of the store to Lagasse, and that Kobus and Lagasse would meet every 1 to 2 weeks to go over the store's finances and unpaid obligations.  Stip. ¶¶100-01.

### 3.    Village Turf's Tax Problems

The parties dispute when Kobus first knew that Village Turf was not paying its withholding taxes.  They agree, however, that by early 2002, "escalating federal and state tax-collection activities" lead Kobus to request Lagasse's assistance.  Stip. ¶124.[10]  Kobus asked Lagasse to investigate and solve the problem.  After investigating, Lagasse discovered that, since sometime in 1996 (i.e., just before Woods retired), Village Turf had not been paying over its federal withholding taxes and it had not been filing the associated tax returns either.  Tr. at 444-46.  As a result, the withheld taxes had not been turned over to the Government but instead were used in the ordinary course of business.  Lagasse prepared delinquent withholding-tax returns for 1996 to 2001, and on April 14, 2002, Village Turf filed the returns, Stip. ¶131, but the company

---

[8] Clay testified that her payroll preparation duties involved entering hours and generating paychecks.  Clay explained that she would take the hours from the timesheets for each employee and post them to the payroll system, which would apply the payroll rates and print the checks.  Tr. at 189-90.  She testified that the system probably printed out checks for tax deposits as well, but that she did not specifically recall.  *Id.*

[9] Lagasse explained the scope of his payroll preparation duties.  Lagasse testified that after he set up each employee's profile in the payroll system, the system automatically calculated wages and taxes, and it could generate reports.  Tr. at 426-28.  Each pay period he would enter the hours worked and the system would generate the checks.  *Id.*

[10] The parties agree that, in early 2002, Kobus gave Lagasse a box that contained correspondence from the IRS, some of which was not opened, and that Kobus told Lagasse that Clay was responsible for the tax problems.  Stip. ¶¶125-26; Tr. at 444-45.

failed to make any payments on its outstanding tax balances and to take any further corrective actions.  In 2002 and 2003, Village Turf continued to fail to remit the withholding taxes it was collecting and it also failed to make any payments on its past-due taxes.  Although Village Turf did file withholding-tax returns for Q2 and Q3 of 2002, the company did not file any withholding-tax returns for 2003.  Stip. ¶¶138, 141, 290.[11]

In July 2003, the IRS assigned Village Turf's account to field officer Bonnie Shrewsbury, who began investigating Village Turf and its tax problems.[12]  Ex. 66; *see* Tr. at 346-47.  Between July and September 2003, Shrewsbury made several attempts to contact Village Turf, both by letter and by telephone, but Kobus did not respond.  Tr. at 350-53; Ex. 66 at 18.  In October 2003, Kobus retained tax attorney Albert Schibani, who contacted Shrewsbury on Village Turf's behalf.  Ex. 66 at 8.

When Schibani first contacted Shrewsbury on October 29, 2003, Shrewsbury told him to have Kobus provide her with 3 months of business records and a Form 433(b), which is the first form a taxpayer must file to start negotiating a resolution to a tax dispute.  Tr. at 353-54; Ex. 66 at 8.  These records were not provided.  Ex. 66 at 12.  On January 5, 2004, Shrewsbury again asked for the Form 433(b), and warned Schibani that the IRS would pursue further enforcement action if the form was not received.  Ex. 66 at 10.  On January 20, 2004, Schibani told Shrewsbury that Village Turf was working on putting together the information and he should have it in about a week, but he never submitted the information.  Ex. 66 at 11-12.  Shrewsbury requested to visit the store to meet with Kobus, to see how business was going and to see the records, but her request was not granted.  Tr. at 356; Ex. 66 at 11.

By this time, Village Turf was experiencing major financial difficulties.  The zoning dispute referred to previously resulted in several substantial fines and caused Village Turf to eliminate its landscaping operations.  Stip. ¶180; *see* Ex. 144.  Village Turf also was experiencing major financial problems, and Lagasse resigned in the first quarter of 2004.

Meanwhile, the IRS had been continuing its investigation of Village Turf.  Between March and May 2004, the IRS sent Kobus several letters.  Tr. at 357-58; Ex. 66 at 14-15.  On March 9, 2004, Shrewsbury visited the retail store, and her notes document that the store was busy and in full operation.  Based on her observations, Shrewsbury concluded that Village Turf had funds to pay the deficient taxes but was choosing not to pay them, and she recommended assessing a penalty on Kobus.  On March 10, 2004, the IRS mailed Kobus a notice proposing to assess a penalty on him personally.  Tr. at 357.  On May 12, 2004, Shrewsbury had the IRS mail Kobus an appointment letter proposing to visit him at his home on May 25, 2004.  Tr. at 358.

---

[11] Prior to opening the retail store, Village Turf filed annual withholding-tax returns because it was a seasonal employer.  After opening the retail store, Village Turf began filing quarterly withholding-tax returns, as done by ordinary, non-seasonal employers.  Village Turf did not, however, file separate withholding-tax returns for the landscaping business and the retail store.

[12] When asked to explain why the IRS waited until July 2003 to begin investigating Village Turf when no withholding-tax returns were filed for many years, Shrewsbury testified that she could "only assume that getting the [delinquent] returns filed [in April 2002] made the balances larger and made it more reasons [*sic*] to issue the case to the field."  Tr. at 379.

On May 13, 2004, the IRS mailed Kobus a letter notifying him that he was being assessed with a penalty under § 6672 and notifying him of his due process rights. Tr. at 359; Stip. ¶291; Ex. 66 at 17.

Having received no response, Shrewsbury went to visit Kobus on May 27, 2004. She found Kobus at home and spoke with him, but Kobus declined a formal interview. Ex. 66 at 19-20; *see* Tr. at 360. During the conversation, Kobus confirmed that Village Turf had a bank account with Burke & Herbert Bank & Trust Company. He explained that the account had been closed because the landscaping operation went out of business and he had liquidated all of its assets. Ex. 66 at 19-20.[13] After the conversation, Shrewsbury asked Burke & Herbert to provide some of Village Turf's records. The bank records revealed that, between 1996 and 2003, Village Turf had funds and that it had written checks for substantial amounts. Ex. 66 at 25; *see* Ex. 214.

On July 7, 2004, Kobus appealed the penalties for 1996 to 2002. Ex. 66 at 24. On November 4, 2005, the IRS notified Kobus that his appeal was denied and it was assessing him with tax penalties under § 6672. Tr. at 365; Stip. ¶292. On October 24, 2006, the IRS assessed Plaintiff with a penalty for each quarter of 2003. Tr. at 389; Stip. ¶293.

### 4.    The Loss of Village Turf's Financial Records

The parties agree that at the time this suit was filed, most of Village Turf's accounting, bank, and payroll records had been destroyed. Stip. ¶311. It is undisputed that Village Turf kept its landscaping records on a computer at the main office, with paper copies of any records stored in the basement and in a rented storage unit. Village Turf kept the records for its retail store on a computer at the store and it maintained paper records on the premises as well. Kobus asserts that, due to several events outside of his control, most of Village Turf's records were lost or destroyed between 2004 and 2007. The Court notes that Shrewsbury began investigating Village Turf in July 2003.

The records from the landscaping business were lost over several years. Kobus testified that when Village Turf moved to a new office location around 2000, some of Village Turf's paper records were lost in the move. Tr. at 136-38. At the new location, Village Turf stored most of its paper records in the basement, Tr. at 136-38, but it also stored some of its files off premises in public storage unit, Stip. ¶302. Kobus testified that in 2004 a flood destroyed all of the paper financial records that were stored in the basement. Tr. at 135-37. In 2006 or 2007, the paper records that were kept in the storage unit also were destroyed, after Village Turf failed to pay rent on the unit. Stip. ¶302. Finally, any digital records that existed were destroyed in 2006 or 2007, when Kobus purchased a new computer and discarded the old one from the landscaping office. Stip. ¶306.

As for the retail store's records, Kobus asserts that many of those records went missing in early 2004, around the time that Lagasse resigned. The Government disputes this because Lagasse testified that all paper and digital records existed when he resigned. In any event, even

---

[13] Shrewsbury's notes reflect that Kobus told her the landscaping business was out of business but at another point in the conversation he said that it currently had 3 employees. Ex. 66 at 19-20.

if the records still existed in 2004, any records in existence were destroyed in 2005, after Village Turf failed to pay rent on the retail store and was evicted. Tr. at 138-39. The landlord changed the locks and did not permit Village Turf to remove anything from the store. Consequently, Kobus could not recover the store's computer or the paper records. Stip. ¶310.

While most of Village Turf's records have been destroyed, the parties were able to recover a few records from third parties. The evidence in this case includes bank records supplied by Village Turf's banks, the tax returns that Village Turf filed, and several financial statements from 2000, which Village Turf had provided to Southern States.

## II.     Discussion

The primary issue in this case is whether Kobus acted willfully. But, as indicated earlier, there are other ancillary issues involved in this case, namely, (1) burden of proof, (2) the accuracy of the 2003 estimate, and (3) the impact of the IRS's sale of Kobus's house. Deciding which party bears the burden of proof is analytically prior to the primary issue of willfulness. Therefore, the Court will first address this issue, then willfulness, and finally issues (2) and (3).

### A.     Burden of Proof

The general rule in tax cases is that assessments made by the IRS are presumed to be correct, and therefore, the taxpayer bears the burden of proof. *Danville Plywood Corp. v. United States*, 889 F.2d 3, 7-8 (Fed. Cir. 1990). However, if a tax assessment is found to be "naked," lacking in "[a]ny foundation whatsoever," the presumption of correctness does not apply and the Government will bear the burden of proof. *United States v. Janis*, 428 U.S. 433, 441 (1976).

Kobus argues that the Government bears the burden of proving he is liable for all the penalties, which will require the Government to prove that Kobus acted willfully. According to Kobus, at the time the IRS assessed him with the penalties, the IRS could not have had sufficient information to determine whether he had acted willfully. Tr. at 16-17. Because the IRS made the assessments without having adequate evidentiary support, Kobus argues that the assessments were naked or arbitrary, and therefore, the Government bears the burden of proof. In the alternative, Kobus argues that the Government bears the burden of proving he acted willfully in 2001, 2002, and 2003 because the Government is counterclaiming to collect tax balances in those periods. Ordinarily, the party asserting a claim or a counterclaim bears the burden of proof.

The Government argues that, because IRS decisions are presumed to be valid, Plaintiff bears the burden of proving that he is not liable by proving that he did not act willfully. The Government asserts that the assessments are not naked because the IRS's decision to impose a penalty is amply supported by the evidence in the record. The Government argues that the IRS's determination of willfulness cannot be considered arbitrary or naked because not only did Shrewsbury thoroughly investigate Village Turf and Kobus, but the IRS Appeals Division independently examined the evidence and Kobus's actions as well. The Government argues that Kobus bears the burden of proof for all of the tax periods at issue because the presumption of correctness applies to the IRS's assessments, irrespective of whether it is a claim of counterclaim.

Ordinarily, when a defendant makes a counterclaim, it bears the burden of proof for that claim. Tax cases, however are different because assessments made by the IRS generally are presumed to be correct. *Danville Plywood*, 889 F.2d at 7-8 (stating that the taxpayer carries the burden of production and the ultimate burden of proof); *United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir. 1990) (same); *Ferguson v. United States*, 484 F.3d 1068, 1077 (8th Cir. 2007) (stating that "[a]ssessments under § 6672 are ordinarily presumed to be correct"). The Government can invoke the presumption of correctness by presenting the Certificate of Assessment, which is prima facie proof that the IRS made a valid assessment. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991). Accordingly, where the Government presents a Certificate of Assessment for a tax period, the taxpayer will bear the burden of proving he is not liable for the assessment. To prevail in a § 6672 case, the taxpayer must establish by a preponderance of the evidence that the government's imposition of the penalty against him is erroneous by proving that he was either not a responsible person or not willful. *See, e.g.*, *Mazo v. United States*, 591 F.2d 1151, 1155 (5th Cir. 1979), *cert. denied*, 444 U.S. 842 (1979); *Brinskele v. United States*, 88 Fed. Cl. 334, 339 (2009) (stating that, under § 6672, the plaintiff bears the burden of proof "both for his own claim and against the government's counterclaim").

In some circumstances, however, IRS assessments are not entitled to the presumption of correctness. The presumption does not apply to assessments that are "naked," lacking in "[a]ny foundation whatsoever." *Janis*, 428 U.S. at 441. To be naked, an assessment must be completely unsupported by the evidence before the court such that the assessment is arbitrary and erroneous. *See id.* at 442 ("proof that an assessment is utterly without foundation is proof that it is arbitrary and erroneous"). As the Seventh Circuit explained, for an assessment to be naked, it "must be more than incorrect"; rather, it must be arbitrary so that the assessment has "no support and the true amount of tax owed is incapable of being ascertained." *Schroeder*, 900 F.2d at 1149; *see also Cook v. United States*, 46 Fed. Cl. 110, 114-15 (2000) (finding that an assessment is not naked if it is supported by any admissible evidence in the record, even if that evidence is different from that originally relied upon by the IRS or is first disclosed in discovery).

In this case, the Government has established that valid assessments were made because it has filed the Certificates of Assessments for all of the tax periods at issue. *See Rocovich*, 933 F.2d at 994 (stating that a "Certificate of Assessments and Payments is routinely used to prove that a tax assessment has in fact been made" and is "presumptive proof of a valid assessment"). Therefore, unless Kobus can show the assessments were naked, the IRS's penalty assessments are entitled to a presumption of correctness.

The record shows that the IRS began investigating Village Turf and Kobus in July 2003, and it gave Kobus numerous opportunities to present exculpatory evidence before it initially assessed him with penalties in May 2004. *See* Ex. 66 at 1-20. Throughout her investigation, Shrewsbury made numerous attempts to contact Kobus and to work with him. Despite knowing that Village Turf had not paid withholding taxes during the preceding 8 years, Kobus made no attempt at cooperating with the IRS—he provided no information or business records, declined every interview request, and did not fill out the paperwork to initiate negotiations with the IRS. With no cooperation from Kobus, Shrewsbury collected what evidence she could by visiting and

observing the store, through what bank records she was able to obtain, and from her conversations with Village Turf's attorney.

When Shrewsbury recommended that the IRS assess Kobus with the penalties, the evidence supporting a finding of willfulness was weaker than it is now. Nonetheless, the IRS's final determination that Kobus acted willfully was not arbitrary because it was based on evidence, including Village Turf's withholding-tax returns showing a balance due, Kobus's status as a corporate officer, Shrewsbury's observations of the store, information from the attorney, and the bank records; the determination was not lacking in "any foundation whatsoever." Even if the evidence was somehow insufficient at the time the IRS assessed the penalties, the information currently in the record supports the IRS's determination and the penalties are neither arbitrary nor erroneous. Because the IRS's assessments are supported by evidence in this record, they cannot accurately be characterized as naked.

Kobus actually is arguing that, because he refused to cooperate with the IRS, the IRS had insufficient information to determine whether he acted willfully and the assessments therefore were naked. That argument is not persuasive. Nor is the Court persuaded by Kobus's argument that he is unfairly prejudiced by the missing financial records. Kobus claims that he was cooperative with the IRS and argues that he could not provide the IRS with any information because all of his business records were destroyed or missing. Tr. at 64, 67-68. However, Kobus knew the IRS was investigating him by October 2003, when he hired Schibani, and he knew that the IRS had requested Village Turf's payroll and financial information. At the time, Village Turf had most of its physical and electronic financial records; it was not until 2004 and 2005 that most of Village Turf's financial records were lost or destroyed. If Plaintiff had cooperated with the IRS from the outset, he could have provided the records to the IRS to show his asserted lack of willfulness.

The Government contends that, because Kobus permitted evidence to be destroyed, it is entitled to "an adverse inference based on plaintiff's spoliation of Village Turf's financial, tax, and other business records." Def.'s Memo Fact & Law, at 29. Were the Government to bear the burden of proof on any elements in this case, the Court would need to decide whether Plaintiff should be liable for spoliation.[14] In other words, the Court will need to decide the spoliation issue only if the Government has a need for evidence that has been destroyed. That need will arise only if Kobus is able to satisfy his burden of proof on the merits. Kobus was on notice of the impending tax dispute no later than October 2003, and he had an obligation to preserve evidence. Many of Village Turf's records were destroyed in 2004 and 2005, after Kobus knew of the dispute. While the Government has made a good case for spoliation, the Court does not need to decide the issue at this juncture, because the Court finds that Plaintiff bears the burden of proof.

---

[14] A party is liable for spoliation if (1) the party controlling the evidence had an obligation to preserve it; (2) the evidence was destroyed with a "culpable" state of mind; and (3) the evidence was relevant. The burden of proof for the 3 factors is on the party seeking to use the missing evidence. *Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007) (describing the "general rules of evidence law").

The Court finds that the IRS's determination that Kobus was willful was not arbitrary and erroneous. The Government has established that the IRS properly assessed Kobus with the penalties and that the penalties are not naked. Therefore, the IRS's penalty assessments are entitled to a presumption of correctness. Accordingly, Kobus bears the burden of proving, by a preponderance of the evidence, that he did not willfully fail to pay over the withholding taxes. He bears the burden for both the claims and counterclaims.

**B.     Willfulness**

The IRS may assess a personal penalty, equal to the amount of the taxes not paid by the employer, on any person who (1) is required "to collect, truthfully account for, and pay over" withheld taxes (someone who is a "responsible person"), and who (2) "willfully" fails to collect, account for, or pay such tax or "willfully" evaded or defeated the tax.[15]  § 6672.  The "willfully" requirement essentially is a culpability standard, and a taxpayer will not be made personally liable for a company's debt unless he is at "personal fault" for failing to pay the taxes.  *Slodov*, 436 U.S. at 254; *Godfrey*, 748 F.2d at 1577.  On one hand, it is unnecessary for a person to have a special or fraudulent intent, an evil motive, or bad purpose for his actions to be considered willful.  *Godfrey*, 748 F.2d at 1577.  On the other hand, a person must be more than merely negligent, and "a person is not 'willful' if as a result of negligence he is unaware of the [nonpayment] of [withholding] taxes."  *Bolding v. United States*, 565 F.2d 663, 672 (Ct. Cl. 1977).  There are two basic ways that a person can willfully fail to pay over withholding taxes: a person acts willfully if the employer has funds to pay the taxes and the person either (1) knowingly chooses not to pay over the withholding taxes or (2) acts with a reckless disregard of a risk that the withholding taxes will not be paid.  *Godfrey*, 748 F.2d at 1577.

First, a person acts willfully if he has actual knowledge of a past or present withholding-tax deficiency and he voluntarily chooses not to pay the United States.[16]  *Id.* at 1576-77; *Mazo*, 591 F.2d at 1155.  More specifically, a person acts willfully as a matter of law if, after he has actual knowledge of a tax deficiency, he uses unencumbered funds to pay other creditors instead of the United States.  *White v. United States*, 372 F.2d 513, 522 (Ct. Cl. 1967); *Godfrey*, 748 F.2d at 1577; *Honey v. United States*, 963 F.2d 1083, 1090-91 (8th Cir. 1992), *cert. denied*, 506 U.S. 1028 (1992).  A person also acts willfully if "he pays employees their net wages at a time when the corporation had insufficient funds to cover the taxes thereon" and, when such funds become available, he prefers subsequent creditors over the United States.  *White*, 372 F.2d at 522.  However, a person does not act willfully if the corporation has no funds that can be paid the government; a person will not be made personally liable for failing to order the impossible.  *Godfrey*, 748 F.2d at 1577.  Nor is a person liable for failing to pay over to the government funds in which another creditor has a lien or interest that is superior to the government's interest in the funds.  *Slodov*, 436 U.S. at 256-58.

---

[15] The parties agree that Kobus was a responsible person.

[16] A taxpayer will be liable for an already-incurred deficiency if he was a responsible person both at the time the deficiency arose and at the time funds are paid to another creditor.  *See Slodov*, 436 U.S. at 245-46.  There is no question that Plaintiff was a responsible person during all relevant periods.

Second, even in the absence of actual knowledge, a person is liable if he acts with a reckless disregard of the facts and obvious and known risks that presently-due withholding taxes are not being paid. *Bolding*, 565 F.2d at 672, 674; *Godfrey*, 748 F.2d at 1577. A responsible person may not "immunize himself from the consequences of his actions by wearing blinders which will shut out all knowledge of the liability for and the nonpayment of its withholding taxes." *Bolding*, 565 F.2d at 674. For example, a person acts with reckless disregard if he fails to "investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted." *Godfrey*, 748 F.2d at 1578 (quoting *Mazo*, 591 F.2d 1151).

Kobus's main argument is that he was merely negligent in mismanaging Village Turf and his actions do not rise to the level of willful. He claims that he never had actual knowledge that Village Turf was not remitting its withholding taxes because he did not keep track of Village Turf's financial affairs. Kobus claims that when he finally learned about the withholding-tax deficiencies in 2002, Village Turf had financial problems and all of its funds were encumbered by security agreements with creditors. He asserts that § 6672 does not make a responsible person a guarantor, and he should not be personally liable for Village Turf's debt because it had no money to pay the taxes.

The Government contends that Kobus knew or should have known that Village Turf was not remitting its withholding taxes. The Government asserts that Kobus either knowingly or recklessly failed to re-delegate the duty to prepare and remit taxes when Woods left in 1997. Accordingly, the Government asserts that Kobus is liable from 1997 forward. The Government also argues that Plaintiff incurred liability for tax periods 1996 to 2001 when Village Turf filed the delinquent withholding-tax returns in April 2002. Subsequently, Kobus had actual knowledge of the tax deficiencies and he permitted Village Turf to pay substantial sums to other creditors instead of using those funds to satisfy the tax deficiencies.

Kobus also advances several other arguments for why he should not be liable for the penalties. He claims that, in recognition of his lack of business knowledge, he delegated the duty to pay taxes to Lagasse in 2001 or 2002. He claims he had no reason to think that Lagasse would not pay the taxes, and therefore, his delegation of tax matters to Lagasse should absolve him from responsibility for the unpaid taxes. Kobus also argues that the "willfulness" standard is a tort-like standard, and therefore, the Government should be held to some standard of care. He argues that even if he was negligent, the Government also was negligent because it did not try to collect on the 1996 to 2001 deficiencies until 2003.

In response, the Government argues that, even though Kobus hired Lagasse to manage the retail store in 2001, Kobus did not delegate the duty to pay all of Village Turf's taxes to Lagasse. It maintains that, even if Kobus did delegate the duty to Lagasse, Kobus is liable for the 2001, 2002, and 2003 taxes because the withholding-tax returns Village Turf filed in 2002 provided notice to Kobus that Lagasse was not paying the taxes and Kobus took no action to correct the problem. Finally, the Government argues that Plaintiff's negligence theory is actually a laches theory, and it is well-settled that laches does not apply to the Government. Closing Arg. Tr. at 58.

For the reasons that follow, the Court finds that Kobus willfully failed to pay over the withholding taxes to the Government for all tax periods at issue. For the purposes of analysis, the Court has divided the relevant time periods into 3 groups based on Village Turf's administrative employees: during Woods's tenure, from 1996 to March 1997; during Clay's tenure, from March 1997 to June 2001; and during Clay's and Lagasse's joint tenure, from June 2001 through Q4 2003.

### 1. From 1996 to March 1997 – While Woods Was Responsible for Preparing the Payroll

The parties agree that Village Turf remitted most of its withholding taxes in 1996, but it missed a few payments for that tax year. Village Turf deposited $39,556, but left an unpaid withholding-tax balance of $5,745. Stip. ¶199. At the time, Kobus had delegated the duty to pay taxes to Woods, and he had no reason to suspect that withholding taxes were not being paid. The Court finds that in 1996, Kobus lacked actual knowledge that Village Turf was not remitting its withholding taxes and he reasonably had delegated the duty to pay withholding taxes. Therefore, the Court finds that Kobus did not willfully fail to pay the taxes in 1996.

Nonetheless, Kobus is liable for the 1996 tax penalty[17] if, after he learned about the deficiency, he knowingly and voluntarily paid unencumbered funds to other creditors instead of paying the IRS. *White*, 372 F.2d at 522; *see Honey*, 963 F.2d at 1087 (stating that if a taxpayer had "knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes is proof of willfulness as a matter of law" (quoting *Olsen v. United States*, 952 F.2d 236, 240 (8th Cir. 1991))). However, Kobus will not be liable for the non-payment if Village Turf did not have funds it could have used to pay the taxes.

Kobus stipulated that he knew about the 1996 tax deficiencies by April 2002 when Village Turf filed the delinquent return. He also stipulated that Village Turf paid out at least $500,000 in 2002[18] and at least $400,000 in 2003. Stip. ¶¶144, 148. These payments are exclusive of any payments made to Southern States or any other secured creditor. Thus, unless the funds paid to the other creditors were encumbered, Village Turf had funds it could have used to pay the tax deficiency but Kobus knowingly and voluntarily chose to pay other creditors instead.

The terms "encumbered" and "unencumbered" have not been defined by the Supreme Court or the Federal Circuit in this context. The Eighth Circuit has described encumbered funds as: "Where the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the

---

[17] Though the Court is referring to the 1996 tax period, this analysis applies to January to March of 1997 as well.

[18] It is not clear from the record when in 2002 the funds were spent, and it is likely that some were spent before April. However, Village Turf was a seasonal business and most of its expenses likely occurred during Q2 and Q3 2002, which were the busy months. For example, Village Turf paid out $101,711 in wages in Q2 2002 (April 1 to June 30), Stip. ¶¶256, 261; and $96,482 in Q3 2002 (July 1 to September 30), Stip. ¶¶267, 272. *See also* Ex. 52.

IRS, the funds are regarded as encumbered if those restrictions preclude the taxpayer from using the funds to pay the trust fund taxes." *Honey*, 963 F.2d at 1090 (quoting *In re Premo*, 116 B.R. 515 (Bankr. E.D. Mich. 1990)). Several other circuits have adopted the Eighth Circuit's definition. *See United States v. Kim*, 111 F.3d 1351, 1359 (7th Cir. 1997); *Barnett v. Internal Rev. Serv.*, 988 F.2d 1449, 1458 (5th Cir. 1993). The Court is persuaded that the *Honey* definition is consistent with both the purpose of § 6672 and Federal Circuit precedent; personal liability will attach only when the employer had funds that could have been paid to the IRS and the taxpayer chose not to pay the IRS.

Kobus claims that after he opened the retail store, all of Village Turf's funds were encumbered by UCC security agreements with Southern States and other creditors. Kobus asserts that the security agreements covered all of Village Turf's bank accounts[19] and all of the proceeds it earned from sales. Pl.'s Memo Fact & Law, at 9; Closing Arg. Tr. at 22. Therefore, Kobus argues, every dollar of revenue was encumbered by a security agreement and he could not have paid the withholding taxes. Kobus admits that he paid other creditors, but he asserts that is not evidence that some of the funds were unencumbered; rather he claims that he improperly was making payments with encumbered funds. Pl.'s Memo Fact & Law, at 9.

The Government contends that despite the seemingly broad language of the security agreements,[20] Village Turf's creditors permitted the company to use the proceeds from sales of inventory to satisfy ordinary business expenses, such as paying wages and rent. It argues that the Court should look to the practice of the parties under the agreements and not solely to the language of the agreement itself. It also argues that Kobus admits that Village Turf used proceeds to pay ordinary business expenses, and Kobus's voluntary payment of other creditors is evidence that the funds were unencumbered.

Although a pre-existing, perfected security interest in collateral, such as inventory, generally is superior to the IRS's interest, *Slodov*, 436 U.S. at 257, blanket security agreements do not necessarily preclude the debtor from using cash proceeds from the sale of inventory to pay tax obligations, *see Honey*, 963 F.2d at 1092 (finding that the secured party had an interest in proceeds the debtor received from the sale of inventory that was superior to the IRS's interest but that the security agreement did not restrict debtor's use of the funds); *Kim*, 111 F.3d at 1361 (same). Here, Village Turf's funds will be considered encumbered only if Southern States put restrictions on Village Turf's use of the proceeds from the sale of inventory that precluded it from using the funds to pay for taxes.

---

[19] Between 2001 and 2003, Village Turf maintained separate bank accounts for the landscaping and retail operations. Stip. ¶95. While the bank account for the retail store may have been subject to the security interests, Village Turf's account at Burke & Herbert was used exclusively for its landscaping operations and would not have been subject to the security interests. Therefore, any funds in the Burke & Herbert account would have been unencumbered.

[20] For example, the security agreement with Southern States provided: that Village Turf granted Southern States a "security under the Uniform Commercial Code" in "[a]ll accounts and inventory at any time hereafter acquired" and in "[a]ll proceeds of such accounts . . . and inventory." Ex. 78.

The record shows that, during the time when Kobus alleges all his funds were encumbered, Village Turf was paying substantial sums to other creditors.  For example, in 2002, Village Turf paid $325,997 in wages, $8,862 in repairs and maintenance, $31,236 in advertising, $30,956 in insurance, and $5,466 in supplies.  Stip. ¶144.  At no time did its creditors tell Village Turf that it could not use its revenues to pay for business expenses.  *See* Tr. at 442-44. Moreover, the creditors must have contemplated payment of revenues to other entities because the agreements specifically required Village Turf to pay any taxes or levies incurred on inventory and to purchase insurance for the inventory.  Ex. 78.  As a matter of logic, it would make no sense for Village Turf's creditors to forbid it from using revenues to pay for operating expenses; if they did, the company would have no funds that could be used to rent a store, pay wages, or pay any other bills, and it would impossible to actually run the business.  The Court finds that the security agreements did not preclude Village Turf from using funds to satisfy ordinary business expenses such as wages, taxes, and insurance.

The Court finds that Kobus has not proven that Village Turf's financial assets were encumbered such that he had no discretion to pay the withholding-tax liability out of the store's revenues.  *See Honey*, 963 F.2d at 1090-91 (taxpayers had burden of proving all funds in an account were proceeds from sale of inventory and therefore encumbered by security interests). The parties have stipulated that Village Turf paid to other creditors at least $500,000 in 2002 and at least $400,000 in 2003.  Stip. ¶¶144, 148.  The Court finds that those funds were unencumbered because Village Turf had discretion to use those funds to pay its operating expenses.

The Court finds that after Kobus knew about the 1996 tax deficiency in April 2002, Village Turf had unencumbered funds available and Kobus chose to use those funds to pay other creditors instead of the Government.  Therefore, Kobus willfully failed to pay Village Turf's withholding taxes for 1996, and he is liable for the penalty.

**2.      From March 1997 to June 2001 – While Clay Was Responsible for Preparing Payroll**

It is undisputed that, up until March 1997, Plaintiff had delegated the duty to pay withholding taxes to Woods, and Village Turf was filing the appropriate returns and remitting most of the taxes.  In March 1997, however, Village Turf stopped making its withholding-tax deposits altogether, and it never resumed making them.  It also stopped filing its withholding-tax returns, an oversight it did not correct until 2002.  The parties stipulated that, after Woods retired in early 1997, Plaintiff did not re-delegate the duty to remit withholding taxes or to prepare the withholding-tax returns.  Plaintiff explained that he assumed that new personnel were doing the same tasks as former personnel and he did not exercise any supervision over his office staff.  Tr. at 26-29.

Plaintiff urges the Court to find that his mismanagement of Village Turf was merely negligent.  Kobus claims he was preoccupied with the operations side of the business and he overlooked reassigning the duty to handle payroll and withholding taxes.  Kobus admits he should have supervised his office staff, but asserts that being a bad business manager does not make him culpable and liable for the penalty.

The Court cannot accept Plaintiff's argument. Kobus characterizes his mistake as innocent mismanagement of a business. But, beyond failing to delegate office tasks or making bad business decisions, Kobus claims he was completely oblivious of the company's expenses and financial situation. Kobus was the company's sole owner and had invested substantial sums of money in the business. *See* Pl.'s Memo of Fact & Law, at 7; Ex. 45 at 4. He also asserts that as early as 1997 the company was in financial trouble. Tr. at 132-33. Nonetheless, he claims he did not read the checks he signed, he did not review financial statements, and he did not exercise any oversight over his employees. Although Kobus did not have a background in business, his experience in the Marine Corps included managing multi-million dollar annual budgets, preparing 5-year budgets, and overseeing a large number of personnel. Stip. ¶6. Given the circumstances, the Court has trouble crediting Kobus's assertions that he was completely ignorant about his company's finances, expenses, and tax obligations.

After Woods left Village Turf, there were many warning signs that something was wrong with the company's finances. First, Village Turf stopped making periodic withholding-tax deposits. Between February 5, 1996 and March 28, 1997, Village Turf made 16 tax deposits[21] with the IRS, totaling $55,000, which were paid by checks signed by Plaintiff. Stip. ¶¶162-64. Frequently, Village Turf's total tax deposits exceeded $5,000 in a month. Exs. 1-3. For example, in March 1997, the last month that Village Turf made a tax deposit, Village Turf remitted two deposits which totaled $9,464.04. Stip. ¶50.

When Village Turf stopped making the deposits, Plaintiff would have stopped signing a large, recurring check. Kobus testified that his failure to notice this change was merely negligent and explained that he was not focused on office tasks and often did not read the documents he signed. Even if signing payroll checks was an administrative duty to which he did not pay much attention, it is difficult to believe that Kobus did not notice the absence of a large check each period. In 1997, Kobus was Village Turf's only corporate officer and the only person with check-signing authority. The Court finds it incredible that Kobus would not have noticed the elimination of such a large, recurring expense. Kobus cannot avoid responsibility for his obligations by adopting a practice of signing documents without reading them, so that he would not have noticed whether or not a recurring check ceased to be presented for his signature. *See Bolding*, 565 F.2d at 673-74 (finding that the responsible person should be charged with knowledge of non-payment in part because he was not asked to sign or countersign checks for payroll tax deposits).[22]

---

[21] Those payments were allocated to the 1995, 1996, and 1997 tax periods. Stip. ¶162. The payments included both the employer and employee FICA taxes.

[22] *See also Fraass Surgical Mfg. Co. v. United States*, 571 F.2d 34, 40 (Ct. Cl. 1978) (finding that a contract clause was enforceable and calling the testimony of the plaintiff corporation's president that he did not read the contract "irrelevant and unacceptable" and stating that "an experienced businessman . . . should know better"); *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875) (stating "[i]t will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained").

17

Second, Village Turf stopped filing its annual withholding-tax returns. Kobus was the sole corporate officer at this time and was responsible for ensuring that the corporation complies with its duties. He should have noticed that he no longer was signing and filing a withholding-tax return. As before, Kobus cannot excuse his failure to notice the missing tax returns by arguing that he never read the documents he signed.

Third, after Village Turf stopped remitting the withholding taxes, it would have had a substantial increase in available revenue. For tax year 1996, Village Turf's tax deposits totaled $39,556, Stip. ¶199, and its total revenue was $414,000, Ex. 45. Thus, Village Turf's tax deposits in 1996 comprised nearly 10% of its total revenue. Kobus testified that he did not notice the increase in revenue because the business was "struggling" at that time. Tr. at 132-33. Rather than explain his failure to notice the change, that the business was having trouble makes it all the more suspicious; a business owner who is experiencing trouble is more likely to scrutinize financial records to see why he is losing money or to find ways to save on expenses. Although most of the relevant financial records have been destroyed, the records that *do* exist indicate that the financial statements showed a discrepancy in the amount of withholding taxes owed. Ex. 88 (year 2000 balance sheet showing federal withholding taxes payable of $19,098); Ex. 89 at 4 (year 2000 profit and loss statement showing a profit of $74.64 on FICA taxes). Had Kobus looked at the financial statements, he would have noticed a problem.

Finally, after Woods left, the payroll duties were taken up by Clay. Clay admitted that she prepared the payroll, but testified that it was never her duty to pay taxes. Tr. at 209-12. Although Plaintiff stipulated that no one was responsible for paying withholding taxes because he never re-delegated the duty to pay them, Plaintiff testified at trial that he delegated the duty to pay withholding taxes to Clay. Whatever the precise scope of duties that Kobus assigned to Clay, the record shows that between March 1997 and June 2001 Clay was the only person who was responsible for the payroll. Kobus testified that he did not train Clay and that he did not exercise any oversight over her. At the time, Clay had no legal obligations to the company because she was never an employee and she was not made a corporate officer until May 2000. Had Kobus exercised any supervision over Clay's performance of her duties, he would have noticed that withholding taxes were not being paid. Kobus, who for several years had been collecting and remitting withholding taxes, would have known that the preparation of payroll necessarily entails tax issues even if he did not know precisely what those issues were. The Court does not agree that it is mere negligence to entrust payroll duties to a non-employee without exercising any supervision over the person.

It seems unlikely that Kobus could have been so oblivious to Village Turf's finances that he would not have known that Village Turf was not remitting its withholding taxes, and the Court finds that Kobus more likely than not knew what was going on. But even if the Court were to credit his testimony that he had no idea what was going on, it would find that Kobus deliberately disregarded an obvious risk that taxes would not be paid by completely ignoring the financial side of the business. Kobus, who was Village Turf's sole corporate officer until 2000, cannot immunize himself from liability through a "deliberate or reckless disregard of the facts and known risks . . . ." *Bolding*, 565 F.2d at 674; *see Teets v. United States*, 29 Fed. Cl. 697, 712 (1993) (holding that a responsible person's "ignorance does not relieve him from liability. Certainly, if he did not know, he should have known.").

The Court finds that Kobus knew Village Turf was not remitting its withholding taxes in 1997.  Kobus took no corrective actions until June 2001, when Kobus allegedly delegated the duty to pay taxes to Lagasse.  Therefore, if Village Turf had funds available that could have been used to pay creditors, Kobus will be liable for the penalty.  The record shows, and the parties agree, that between 1997 and 2001 Village Turf paid funds to other creditors well in excess of its withholding-tax liabilities[23] for those periods.  Stip. ¶¶62-76.  Accordingly, the Court concludes that Kobus willfully failed to pay over the withholding taxes from March 1997 to June 2001, and it finds that he is liable for the penalties for those time periods.

### 3.   From June 2001 to 2003 – While Both Clay and Lagasse Had Payroll Preparation Duties

Village Turf opened the retail store in June 2001.  Kobus asserts that he should not be liable for the penalties incurred by the store because he had delegated the duty to pay the retail store's taxes to Lagasse.[24]  Kobus argues that it was reasonable to assume that a trained business professional would perform the duties assigned, and he had no reason to suspect that Lagasse was not paying the store's withholding taxes.  Pl.'s Memo Fact & Law, at 6-7.  Kobus claims that Lagasse had full authority to pay all withholding taxes as they came due, Tr. at 37-39, and that Lagasse never mentioned any withholding tax deficiencies to him, Tr. at 50-51, 54.  Kobus also continues to argue that he should not be liable for any deficiency incurred by the landscaping business because he did not know that no one was paying those withholding taxes.

Kobus maintains that when he asked Lagasse to investigate Village Turf's tax problem, Lagasse took over the duty to pay both the past deficiencies and the presently-due withholding taxes incurred by the landscaping operation.  Kobus testified that he turned the whole problem over to Lagasse and he did not exercise much oversight over Lagasse's handling of the situation.  Tr. at 61-62, 169.  Kobus testified that he occasionally checked up on the issue by asking Lagasse about the status of negotiating a plan with the IRS, but that Lagasse always told him he would have a solution soon.  Then, Lagasse resigned.  Tr. at 50-52.

Kobus appears to assert that part of the reason he hired Lagasse in 2001 was to take care of Village Turf's tax problem.  Pl.'s Memo Fact & Law, at 6; Closing Arg. Tr. at 5-6.  However, Kobus also claims that he did not know about the tax problem until 2002.  Kobus backed away from his assertion at trial when he testified that, although he had Lagasse help him with some financial issues before the store opened, he did not think the issues were tax related.  Tr. at 119-21.  Kobus also tried to back away from his admission that he knew about the tax deficiencies in April 2002, *see* Closing Arg. Tr. at 44; Kobus testified that, while he knew Village Turf had a tax problem in 2002, he did not necessarily know that the withholding taxes were not being paid

---

[23] According to the withholding-tax returns, the unpaid withholding taxes were $150,279.  *See* Exs. 26-31.  Between 1997 and 2001, Village Turf paid out many hundreds of thousands of dollars which included wages, maintenance, rent, supplies, insurance, and advertising.  *See* Stip. ¶¶65-76.

[24] Kobus seems to assert that it was Lagasse's duty to pay taxes for both the landscaping operations and the retail store, but his testimony was unclear.

because he did not read the withholding-tax returns that Village Turf filed.  Tr. at 163-70.  Kobus had stipulated, however, that he knew that Village Turf had unpaid withholding-tax liabilities on April 14, 2002, when Village Turf filed the tax returns for 1996 to 2001.  Stip. ¶178 ("On 4/14/2002, . . . Kobus knew that Village Turf had unpaid employment tax liabilities to the IRS for each of [the tax years 1996 to 2001]").

Kobus's testimony was unclear on a number of issues because it frequently contained exchanges such as the following excerpt from his cross-examination.

> Q      Did you delegate to Mr. Lagasse the responsibility of filing Village Turf's employment tax returns from the date you gave him the [fix-the-tax-problems] job until the day he left the company?

> A      I would think that as Dan [Lagasse] went through and had talks, supposedly talked with the IRS and the state and our creditors, that he came up with a plan and if he needed to do some filing, he would have brought that to my attention.

> Q      Did you tell him that it was his job to file those returns?

> A      I told him he had the authority to file those returns if he had to refile them.

> Q      Did you tell him it was his responsibility to file the returns?

> A      Did I put it in writing with his name on it and hand it to him?  No.  You're absolutely right, I didn't do that.

> Q      That's not what I asked.  I asked did you tell him that it was his responsibility to file the returns?

> A      No, not in so many words.

> Q      Did you tell Mr. Lagasse that it was his responsibility to pay federal tax deposits on all future tax periods to the IRS in connection with payroll obligations of Village Turf?

> A      Yes, when it came to the store.

> Q      It was his responsibility for the store?

> A      Oh, yeah.

Tr. at 167-68.

In contrast, Lagasse testified that he had a much more limited scope of duties and that Kobus retained significant authority over the retail store's financial affairs.  Lagasse testified that

he was hired to run the retail store, and his duties did not encompass taking care of taxes for the landscaping business. Tr. at 421-24. Lagasse testified that, while he had authority to sign payroll checks and to pay rent, he had to get Kobus's permission before paying any other bills. Tr. at 436-38. He testified that he set up the store's accounting systems and that initially some of the taxes automatically were sent to either the state or the IRS. Tr. at 429. He testified that Kobus asked him to stop automatically remitting the taxes so that both the store and landscaping bills could be processed centrally. Tr. at 429-31. He also testified that the accounting software automatically calculated the withholding taxes and it generated reports that would show the balances. Tr. at 427-29.

Lagasse testified that the store always had trouble paying bills because Kobus only gave the store $5,000 in operating capital. Tr. at 437. Lagasse testified that he would have weekly or biweekly meetings with Kobus, where he would present Kobus with a list of accounts payable and accounts receivable. Kobus would go through the list of bills and decide which would get paid. Tr. at 436-40; Tr. at 463-66. Due to cash constraints, many bills were not immediately paid. Lagasse testified that his monthly reports showed the withholding-tax liabilities, and he repeatedly asked Kobus about whether Village Turf was paying these taxes. Tr. at 463-66. He testified that Kobus always told him not worry about the perceived problem because Kobus or Clay[25] was taking care of it. Tr. at 463-66, 487-88.

Lagasse admitted that, in 2002, he helped Kobus investigate the withholding tax problems and that he prepared the withholding-tax returns for 1996 to 2001. He testified that he helped with the tax problem because Kobus asked him to, but it ordinarily was not his job to handle Village Turf's taxes. Tr. 444-46, 451-52.

The Court finds Lagasse's testimony to be credible. His testimony was internally consistent. Based on Lagasse's demeanor, it is the Court's impression that Lagasse testified honestly and to the best of his recollection. This is in contrast to Kobus's evasive testimony, which at times was ambiguous and contradictory. On several occasions, Kobus would not admit to facts that he had stipulated were true.

The Court finds that Plaintiff did not delegate the duty to pay taxes to Lagasse. The Court credits Lagasse's testimony that he brought the unpaid taxes to Kobus's attention and Kobus told him not to worry about it because it was being taken care of. The Court finds that Plaintiff retained control over the payment of bills and he did not permit Lagasse to pay the taxes without getting approval first. Therefore, the Court finds that Kobus knew in 2001 that the withholding taxes were not being paid and he knowingly chose not to pay over the withheld taxes to the Government.

Moreover, even if the Court were to credit Kobus's testimony and find that Kobus delegated to Lagasse the duty to pay all of Village Turf's taxes, Kobus still would be liable for the penalties. Kobus hired Lagasse in 2001. By April 2002, Kobus knew that Village Turf did not pay its withholding taxes in 2001. If Kobus reasonably had delegated the duty to pay taxes to Lagasse in 2001, Kobus recklessly failed to start supervising Lagasse in April 2002, after

---

[25] At this time, Clay still was taking care of any payroll for the landscaping operations.

21

Kobus learned that the 2001 taxes were not paid. At that point, he had a duty to correct Lagasse's mismanagement and to exercise some oversight to ensure that the taxes were paid. *Godfrey*, 748 F.2d at 1578; *see Mazo*, 591 F.2d at 1157 (finding that, after a corporate official had actual notice of a deficiency, the official could not escape liability by delegating his responsibility to a subordinate). Kobus did not do so, and therefore, he knowingly or recklessly failed to remit the taxes.

As discussed above, Village Turf paid to non-secured creditors over $500,000 in 2002 and over $400,000 in 2003. The Court finds that, between 2001 and 2003, Village Turf had unencumbered funds that it could have used to pay the tax deficiencies. Therefore, the Court finds that Kobus knowingly paid other creditors in preference to the United States, and he willfully failed to pay over withholding taxes from June 2001 through 2003. Accordingly, Kobus is liable for the penalties for those periods.

### 4.    The IRS's Negligence and Duty to Mitigate Damages

Before concluding its discussion of willfulness, the Court must address the other arguments made by Plaintiff. In his answer to the Government's counterclaims, Kobus asserts that the Government's claims are barred by laches. Pl.'s Am. Answer ¶32. In his briefings and oral arguments, Kobus admits that laches generally is not available against the United States. Pl.'s Memo Fact & Law, at 8. Instead, Kobus argues that the willfulness standard is a tort-like standard and therefore the Government should be held to a reasonable standard of care in initiating tax collection efforts. *Id.* at 4-5, 8; Closing Arg. Tr. at 8-9. According to Kobus, "The facts in this case are quite analogous to the defense of contributory negligence." Pl.'s Memo Fact & Law, at 8. Had the Government taken enforcement actions sooner, Village Turf would have corrected its mistake without incurring such a large tax balance. *Id.* at 8-9. He asserts that the Government "needs to take responsibility for its inattention to the situation at Village Turf, Inc., as well." *Id.* at 5.

The Government raises several arguments against Kobus's theory. The Government first asserts that no inequity results by holding Kobus responsible for his willful failure to comply with the law. Def.'s Memo Fact & Law, at 17-18. Next, the Government argues that there is no authority for Kobus's contributory negligence defense. Finally, the Government asserts that Kobus's argument is actually a laches argument because he is claiming "that it would be inequitable, as a result of undue delay, for the Government to enforce the [withholding tax] penalties." *Id.* at 18.

The Court finds that Kobus has advanced no meritorious basis for grafting a contributory negligence defense onto the willfulness standard under § 6672 and the Court perceives no reason to adopt such a defense in general. The Court also finds that it is not inequitable to hold Kobus responsible for the tax penalties, especially when the IRS acted within the statutorily provided time frame. The IRS generally must assess a tax within 3 years after the return was filed, 26 U.S.C. § 6501(a), but when a taxpayer fails to file a return, the tax may be assessed at any time, § 6501(c)(3). Village Turf filed returns for 1996 to 2001 in April 2002, and the IRS notified Village Turf of the delinquent taxes in May 2002. In May 2004, the IRS notified Kobus that he was being assessed with the personal penalties for 1996 to 2001 and Q2 and Q3 of 2002. Village

Turf never filed withholding-tax returns for any quarter of 2003, and the IRS assessed Kobus with personal penalties in 2006. Kobus has not identified any inequitable conduct or delay by the IRS.

Kobus advances another equitable theory in his closing argument. He asserts that the Government has a duty to mitigate its damages, citing to *Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990). Closing Arg. Tr. at 49. He asserts that the IRS knew of Village Turf's failure to pay taxes for 5 years before it took any action to collect. *Id.* In closing, he recognizes that many of his equitable theories were not raised in a pleading and he requests that the pleadings be amended to conform to the evidence. *Id.* at 50-51.

The Government admits that the Government has a duty to mitigate damages in contract actions, but asserts that the fact that a contracting party has a duty to mitigate damages does not mean that the Government has a duty to mitigate damages in actions that do not arise under contract law. *Id.* at 58-59. It also objects to Kobus's request to amend the pleadings. *Id.* at 50.

The Court is not persuaded that the IRS must mitigate its damages. *Ketchikan Pulp*, which is a decision by another Court of Federal Claims judge, is not binding on this Court. Even if it were, *Ketchikan Pulp* is inapposite to this case because it was a breach of contract case and has no relation to the tax matters at issue here.[26] The Court also denies Kobus's request to amend the pleadings. Not only are his equitable theories lacking merit, but the Court finds no basis to grant his post-trial request.

## C.    The Amounts of the 2003 Assessments

The parties agree that the amounts of the assessments for 1996 to 2001 and for Q2 and Q3 of 2002, which were based on the withholding-tax returns that Village Turf filed, are accurate. Kobus asserts, however, that the 2003 penalty amounts are inaccurate and "arbitrary and capricious." Pl.'s Am. Answer ¶31.

Village Turf did not file any withholding-tax returns for 2003, so Shrewsbury estimated Village Turf's 2003 liability and prepared substitute returns pursuant to IRS procedure. Tr. at 380-85; *see* 26 U.S.C. § 6020. Shrewsbury based her estimates on the numbers reported in Village Turf's Q2 2002 withholding-tax return. She estimated that, in all 4 quarters of 2003, Village Turf had the same wages as in Q2 of 2002, resulting in an annual wage estimate of $481,352.23. Stip. ¶¶282-84; Tr. at 382-84. She then estimated Village Turf's FICA liability and federal income tax withholding liability, using 20% as the tax withholding level. Tr. at 384-86; *see* Ex. 68 at 26-27. This brought Village Turf's total withholding-tax deficiency to approximately $130,000 for 2003. *See* Stip. ¶¶284-86.

---

[26] In *Ketchikan Pulp* the Court stated that Government had "a duty to mitigate its damages when a purchaser or seller breaches its contract" and it found that the Government in that case properly sold timber to another purchaser to offset the damages incurred when the original purchaser backed out. *Ketchikan Pulp*, 20 Cl. Ct. at 166-67.

Kobus argues that the Government bears the burden of proving the accuracy of the amounts of the 2003 penalty assessments because the penalties were based on estimates. He maintains that the assessments should be adjusted down based on the wages reported in Village Turf's 2003 Form 1120S, its corporate income-tax return. Kobus asserts that if the estimates were based on the more accurate numbers from the Form 1120S, Village Turf's total tax liability for 2003 would be $46,899.39. Pl.'s Memo Fact & Law, at 11. He also asserts that the IRS should have looked to the W-2s to get more accurate wage information.

The Government admits that the assessments were based on Shrewsbury's estimates, but asserts that the penalty amounts are presumptively valid because the method for making the estimates was reasonable and logical. The estimates were calculated using the methodologies contained in the IRS's field manual. Tr. at 382-86, 390; Stip. ¶¶282-85. Because the amounts are presumptively correct, the Government claims that Plaintiff bears the burden of proving that the amounts are incorrect and of proving the correct amounts. The Government also argues that the 2003 Form 1120S, which was filed on November 16, 2006, *see* Ex. 53, is not a reliable source for Village Turf's wages because the IRS had assessed Kobus with the 2003 tax penalties on October 24, 2006. It also notes that the IRS does not get access to the W-2s, which are filed with the Social Security Administration ("SSA"), until years after the forms are processed.

When a taxpayer does not maintain adequate records, the IRS can estimate the taxpayer's liability. The presumption of correctness applies to all properly made assessments, including estimates, because if it did not, taxpayers could defeat any assessment by not maintaining proper records. Judge Firestone notes in *Brinskele*, "where the IRS estimates a tax liability because the taxpayer has failed to maintain adequate records . . . courts have uniformly rejected challenges to the presumption of correctness associated with the IRS assessment." 88 Fed. Cl. at 339. The Eighth Circuit has stated that, even if an assessment is an estimate, the presumption applies if "the method for making the estimate is reasonable and logical." *Ferguson*, 484 F.3d at 1077. Similarly, the Seventh Circuit has found that "[w]hen a court is faced with an incorrect but otherwise valid assessment the proper course is not to void the assessment . . . but to determine what, if anything, the taxpayer owes the government." *Schroeder*, 900 F.2d at 1148.

In this case, while the IRS based the estimates on limited information, the estimates were not arbitrary and its actions were reasonable and lawful. The IRS did not have more information because Village Turf did not file a withholding-tax return or a timely income-tax return. Nor did Kobus cooperate in the investigation by providing information or business records. The Court agrees with the approach taken by other circuits, and a taxpayer "who cannot produce adequate records may not complain of the inevitable inaccuracies in assessment their default occasions." *Fergusson*, 484 F.3d at 1077-78 (quoting *Caulfield v. Comm'r*, 33 F.3d 991, 993-94 (8th Cir. 1994)); *see Brinskele*, 88 Fed. Cl. at 339. Therefore, the assessments are presumptively correct unless Kobus can prove by a preponderance of the evidence that they are wrong.

The Court finds that Kobus has not presented sufficient evidence for the Court to determine whether his actual withholding-tax deficiencies for 2003 are lower than the assessed amounts. Kobus asserts that the estimates are high, and points to Village Turf's 2003 Form 1120S and the W-2s of its employees. The Form 1120S, however, was filed after Kobus had notice of this dispute. It is not clear when the W-2s were filed, but Village Turf did not always

file all of its W-2s,[27] so the Court is not convinced that the 2003 W-2s represent all of Village Turf's wages for that year.

The Court notes that it is troubled by the amounts of the 2003 penalties, which amount to $33,273.17 per quarter or over $130,000 for the year. In 2002, Village Turf's withholding tax liability was $20,075 for Q2 and $19,513 for Q3, or under $40,000 for the year. Stip. ¶¶261, 272. In 2001, its total withholding-tax liability was $75,473.[28] Stip. ¶251. Shrewsbury's estimate was made on the assumption, per IRS manual procedure, that Village Turf's employees had 20% of their income withheld for federal income taxes. In prior years, Village Turf's income-tax withholding level was less than 10%. *See* Exs. 26-31; Stip. ¶¶204-50. Shrewsbury's assumption that Village Turf had a withholding level of 20% seems to have inflated Village Turf's tax liability for 2003 to be greater than in any other year.

It seems plausible that the 2003 penalty assessments are higher than the actual amounts of unpaid withholding taxes. The parties stipulated that in 2003 Village Turf paid out at least $259,948 in wages, Stip. ¶148, although the Government asserts the wages could have been higher. Given the absence of any reliable evidence of Village Turf's 2003 wages, the Court cannot say that Kobus has proven by a preponderance of the evidence that the 2003 estimates were wrong. The Court speculates that a more accurate amount might be calculated by adjusting the income-tax withholding level to its historic level of around 10%. However, the record contains insufficient evidence due to the destruction of Village Turf's records for the Court to reach that conclusion.

The Court's conclusion is colored by the Government's assertion that Plaintiff permitted evidence to be destroyed. Between 2004 and 2006, most of Village Turf's paper records were destroyed and its electronic records were deleted. Were the record to contain some evidence in Plaintiff's favor on the proper amounts of the assessments, the Court would need to decide whether Plaintiff should be liable for spoliation. Had Village Turf retained all of its records, the Government could have had evidence to rebut Kobus's claims. As discussed supra, Kobus was aware of the IRS's investigation by October 2003, and he had an obligation to preserve Village Turf's financial records. Tr. at 140. Given these facts, the Government has presented a good case for spoliation, but the Court does not have to reach that question because Kobus has not established the proper amount by a preponderance of the evidence.

### D.      The IRS's Redemption of Kobus's Home

The final question at issue in this case is whether the IRS improperly preferred itself to Kobus's other creditors when it purchased and resold Kobus's house after Southern States foreclosed on it. The IRS applied the profit it earned by reselling the house to Kobus's tax balance. Kobus contends that Fairfax County had a lien on his home that was senior to the tax

---

[27] The SSA did not receive Lagasse's W-2s for 2001, 2002, and 2003, and Lagasse had to write letters to the SSA to get the records corrected. Exs. 150, 152; Tr. at 455-56.

[28] Village Turf's wages for 2001 were $462,243. Stip. ¶246; Ex. 31. The IRS's wage estimate for 2003 was $481,352.23. Stip. ¶¶283-84.

lien, and therefore, the IRS should have paid the funds to Fairfax County.  Kobus asks the Court
to order the Government to pay the funds to Fairfax County.  The relevant facts are as follows.

Between 2001 and 2007, several of Kobus's creditors acquired interests in Kobus's
home.  In early 2001, when Village Turf entered into the dealership agreement with Southern
States, Kobus gave Southern States a deed of trust on his house.  Later that year, Village Turf
became involved with a zoning dispute with Fairfax County and the County assessed Kobus with
over $100,000 in fines for various violations.  In December 2001 and January 2005, the County
entered money judgments against Village Turf and Kobus.  Exs. 142, 144.  Although the record
in this case contains the County's judgments, there is no evidence showing that the County filed
those judgments as liens against Kobus's personal home.  Two years later, in January 2007, the
IRS placed a tax lien on Kobus's home as part of its effort to collect on the assessed penalties.
The parties agree that Southern States, through the deed of trust, held a perfected lien on Kobus's
home and that Southern States's lien was senior to the IRS's tax lien and to any lien held by the
County.

After the retail store went out of business, Village Turf still had an unpaid inventory
balance with Southern States.  On April 3, 2008, Southern States foreclosed on Kobus's house.
The house was sold at auction to a person who is not a party to this case and Southern States
received the proceeds.  Soon after the house was sold, the IRS elected to exercise its statutory
right to "redeem" the house by purchasing it from the winner of the auction for the purchase
price.  Stip. ¶296; *see* 26 U.S.C. § 7425(d).  The IRS then resold the property for a profit, and it
applied the proceeds to Kobus's unpaid penalty balance.  Stip. ¶¶296-97.

Under federal law, if the IRS holds a valid tax lien on a property, it acquires a right to
redeem the property whenever a senior creditor forecloses on the property and thereby
discharges the tax lien.  § 7425(d); Treas. Reg. § 301.7425-4(a) (2010).  The IRS can redeem the
property after the senior lien-holder sells the property at a public auction by purchasing it from
the buyer for the purchase price paid plus interest and costs.  The IRS then may try to resell the
property at higher price and apply any profit to the taxpayer's liability.  *Southwest Prods. Co. v.
United States*, 882 F.2d 113, 117-18 (4th Cir. 1989).  The provision allows the IRS to capture the
difference between the auction price, which is usually a distress price, and the property's fair
market value.  *Id.* at 118.  The IRS's right of redemption is separate from any rights it has as a
junior lien holder.

Kobus does not dispute that the IRS had a right to redeem the property.  Instead, he
asserts that the IRS should have paid to Fairfax County the profits it received from redeeming
and reselling Plaintiff's house.  Kobus contends that, because Fairfax County had a senior lien on
the property, it was a senior creditor to the United States.  Therefore, Kobus argues, Fairfax
County was entitled to be paid the funds the IRS received from the resale.

The Government advances two arguments asserting that Kobus has not alleged a basis for
recovery.[29]  It first argues that Fairfax County never had an enforceable interest in the house

[29] The Government also argues in passing that Kobus does not have standing to challenge the
sale.  The parties have not pursued or fully briefed the standing issue.  The Court therefore will assume

because the County failed to perfect its interest in the property by filing a judgment lien. The Court agrees with the Government. Kobus has not presented a copy of any judgment lien from Fairfax County's land records and he has not presented any other evidence showing that Fairfax County had a perfected judgment lien on his property. Therefore, he has not established that Fairfax County had an interest in his property that was superior to the IRS's tax lien. *See* VA. CODE ANN. § 8.01-458 (a judgment does not become a lien on real property until the "judgment is recorded on the judgment lien docket of the clerk's office of the county or city where such land is situated . . . ."); *In re Charco, Inc.*, 432 F.3d 300, 306 (4th Cir. 2005) (to have priority over a federal tax lien, judgment must be perfected against debtor's property pursuant to state law).

Second, the Government argues that, even if the County had a valid lien, the lien was extinguished when Southern States foreclosed on the property. Again, the Court agrees with the Government. Under Virginia law, junior liens are discharged when a senior lien-holder sells the property. *Schmidt and Wilson, Inc. v. Carneal*, 180 S.E. 325, 326-27 (Va. 1935); *Southwest Prods.*, 882 F.2d at 115 n.1 (stating that if a senior creditor forecloses on a property, "under Virginia law junior liens . . . are discharged at the time of sale"). During closing arguments, Kobus agreed that a foreclosure sale by a senior lien holder cut off the rights of junior lien holders. Closing Arg. Tr. at 38-40.

Thus, when Southern States sold the property, all junior interests were extinguished, including the IRS's lien and any lien held by Fairfax County. Even if the County's lien was senior to the IRS's lien on the property, that relationship was extinguished when Southern States foreclosed. Because Southern States's foreclosure completely extinguished the interests of all junior creditors, the IRS was under no obligation to pay any of the redemption proceeds to Fairfax County. So even assuming Fairfax County had a perfected interest in the property, that interest was cutoff and the IRS properly applied the redemption proceeds to Kobus's tax balance. Accordingly, the Court finds that Kobus has not established that the Government must remit the proceeds of the sale to Fairfax County.

## III.   Conclusion

For the reasons set forth above, Plaintiff's request for a refund is **DENIED** and the Government's counterclaims are **GRANTED**. The Government represented that collection efforts have been ongoing. Therefore, the Government is ordered to obtain updated account and balance information. The parties are ordered to confer and if possible stipulate as to the correct outstanding balances on Plaintiff's accounts. The parties shall file a joint status report by Thursday, March 29, 2012.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge

---

that Kobus has standing because, whether the Court considers this issue based on standing or on the merits, the result is the same: Kobus is not entitled to any recovery.